THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:08-CR-174-FL

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) |
| v. | )<br>) **MEMORANDUM & RECOMMENDATION** |
| KENRICUS MARQUELL WILLIAMS | )<br>) |
| Defendant. | )<br>)<br>) |

This matter is before the court on Defendant Kendricus Marquell William's motion to suppress any and all statements he provided to law enforcement, including statements he gave to detectives from the Raleigh, Wake Forest, and Wilson Police Departments [DE-47], following an alleged invocation of his *Miranda* rights on March 11, 2008, during an interview at the Wake County Sheriff's Office ("WCSO"). In support of his motion, Williams asserts that law enforcement continued the interview after he clearly invoked both his right to counsel and to remain silent by saying, "I don't think I want to say anything more until I talk to a lawyer." The Government responded to the motion [DE-49]. On December 5, 2008, the Court held a hearing on the matter to develop the record [DE-82]. Accordingly, this matter is ripe for review.

### FACTS AND PROCEDURAL HISTORY

Following the robbery of the Han-DE Hugo's store located at 6927 Buffaloe Road in Raleigh, NC, Williams fled the scene in a car driven by Daniel Antonio Sanders. An officer with the WSCO observed the vehicle as it sped from the scene, and unsuccessfully

1

attempted a felony stop. Following a high speed chase, the vehicle crashed into a tree. Sanders and Williams attempted to flee on foot but were apprehended shortly thereafter by law enforcement. Following the suspects' arrest, members of the WCSO searched the vehicle pursuant to a warrant and seized stolen money, stolen Newport Cigarettes, stolen Dutch Master cigars and a firearm.

Law enforcement then accompanied Williams to Wake Medical Center for treatment of his minor injuries. During transport, Williams was overheard saying, he "had to do what [he] had to do," he had "a little boy who wants a kidney transplant," and that "nobody but my baby mother was giving me any money." Williams asked Deputy Menzie if he needed to call an attorney, to which Menzie responded, "why would you need an attorney?" Williams answered, "for running from the police." While waiting for medical attention at the hospital, Williams expressed an interest in speaking with Detective Blackwell of the WCSO. According to Blackwell's testimony at the suppression hearing, he did not question Williams at the hospital, feeling it prudent to obtain a written rights waiver form beforehand. After his refusal of medical attention and subsequent release from the care of medical personnel, officers transported Williams to the second floor interview room of the WCSO.

Upon his arrival at approximately 8:35 pm, Blackwell and Sergeant Haywood asked Williams if he still desired to speak with them and he informed them that he did. The officers advised him of his right to counsel and to remain silent. At around 8:50 pm Blackwell confirmed in writing the advisement of *Miranda* rights and Williams' understanding of those rights which he expressly waived by signing the *Miranda* form with an alias, Dandergo Graham. When asked by law enforcement whether Dandergo Graham was his true name, Williams answered yes.

2

The exact number of confessions to robberies that preceded the defendant's alleged invocation of rights is in dispute. The government asserts that the defendant confessed to three robberies and to the accidental shooting of a store clerk prior to the alleged invocation. The defendant contends that he confessed to one robbery and that when Haywood asked if he committed any other robberies he shook his head "no." Both the government and Williams agree that around this time during the interview, Detective Hall of the Raleigh Police Department, who observed portions of the interview via a surveillance camera, overheard Williams say, "I don't think I want to say anything more until I talk to a lawyer." Although Blackwell was the officer questioning Williams at the time, he testified at the hearing that he did not hear Williams' alleged invocation of rights.

It appears that Williams continued to speak after the alleged invocation, expressing a desire to see his son and voluntarily giving additional details regarding the Wake Forest, Raleigh, and Wake County cases. Following this monologue, law enforcement continued to question Williams and he eventually gave them his real name. On two additional occasions during the interview, at approximately 10:30 pm and 12:15 am, Williams confirmed his desire to continue to speak with law enforcement. At the conclusion of the interview, Williams guided law enforcement to the scene of four Raleigh robberies during which he confessed to additional robberies in Wilson and Bailey.

On March 12, 2008, Williams met with Detective Kearney of the Wilson Police Department. Kearney advised Williams of his right to remain silent and right to an attorney. Kearney provided him with a *Miranda* rights waiver form, which he signed and initialed indicating his understanding of his rights and voluntary waiver of the same. Williams confessed to the commission of two Wilson County robberies during the interrogation and

3

signed written statements.

In total, Williams confessed to committing nine robberies in Wake and Wilson Counties. He was subsequently charged under a 20 count indictment filed in the Eastern District of North Carolina on June 11, 2008 [DE-1]. The pending counts include: 1) nine (9) counts of Hobbs Act Robbery in violation of 18 U.S.C. § 1951 , 2) nine (9) counts of using and carrying a firearm during a crime of violence in violation if 18 U.S.C. § 924(c)(1)(A), 3) one (1) count of Felon in possession of a firearm in violation of 18 U.S.C. §§922(g)(1), 924 and 4) one (1) count of Accessory to Hobbs Act Robbery in violation of 18 U.S.C. §3.

## DISCUSSION

The defense contends that Williams clearly invoked his right to counsel and his right to remain silent during the interview with Wake County detectives on March 11, 2008 when he stated, "I don't think I want to say anything more until I talk to a lawyer." Because law enforcement did not cease to question him after this statement, Williams asks the court to suppress any statements and evidence obtained as a result of those statements following his alleged invocation of the right to silence and to counsel.

This court's inquiry is limited to whether the statement Williams made to law enforcement on March 11, 2008 was a clear invocation of his *Miranda* rights as required by the Supreme Court. Because it appears that Williams did not clearly, unequivocally, and unambiguously request the assistance of counsel or assert his right to remain silent during custodial interrogation by law enforcement after previously waiving those rights pursuant to a valid *Miranda* waiver form, this court recommends that his motion to suppress be denied.

4

Pursuant to the Supreme Court's ruling in *Edwards v. Arizona*, 451 U.S. 477 (1981), law enforcement officers must immediately cease questioning a subject who clearly asserts his right to have counsel present during custodial interrogation. The Supreme Court refined the *Edwards* holding in *United States v. Davis*, 512 U.S. 452 (1994), giving guidance as to what constitutes a clear assertion of *Miranda* rights by defining what it is not. The Court held that if a suspect makes a "reference to an attorney that is ambiguous or equivocal in that a reasonable officer, in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," the statement is not a clear assertion of *Miranda* rights and law enforcement need not cease questioning.

The statement at issue made by Williams during interrogation, "I don't think I want to say anything more until I talk to a lawyer" was not a clear assertion of his right to an attorney or to remain silent sufficient to necessitate the cessation of questioning required by *Edwards*. The Fourth Circuit has consistently found similar statements to be ambiguous and not a clear invocation of *Miranda* rights. *See Johnson v. Harkleroad,* 104 Fed.Appx. 858, 867 (4th Cir. 2004)("Maybe I should stop talking and get a lawyer," was equivocal and insufficient to invoke *Edwards*.); *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000)("I think I need a lawyer" was ambiguous and equivocal.); *Mueller v. Angelone*, 181 F.3d 557 (4th Cir. 1999)("Do you think I need an attorney here" was not a clear invocation of the right to counsel.)

The Court agrees with the government that the words in the statement, "I don't think" plainly and objectively created ambiguity on the issue of whether the defendant desired counsel present. *Burket,* 208 F.3d at 198; *See also Mueller,* 181 F.3d at 557. The

5

government is not obligated to ask a defendant clarifying questions to determine an ambiguous statement's meaning. *Davis*, 512 U.S. at 460. Detective Hall, apparently the only law enforcement officer who heard the statement, was neither obligated to enter the interview room to ask Williams to clarify nor to stop the questioning. The circumstances under which the statement was made objectively indicate that the defendant did not intend the statement as a clear assertion of his 5th Amendment rights. As such, law enforcement did not act improperly when they continued the interview. Furthermore, Williams continued his confessional dialogue following the statement without prompting from Detective Blackwell, and confirmed on a number of occasions throughout the interview his desire to continue speaking with law enforcement. It appears that at no point in the interview did Williams clearly and unequivocally request the presence of a lawyer.

## CONCLUSION

Because Williams was undisputedly advised and understood his *Miranda* rights, he validly waived them on two occasions in writing, and he did not request an attorney's presence during questioning, this court RECOMMENDS that his motion to suppress statements following the statement, "I don't think I want to say anything more until I talk to a lawyer," be DENIED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual

findings and legal conclusions not objected to, and accepted by, the District Court.

This 23rd day of December, 2008.

DAVID W. DANIEL
United States Magistrate Judge